Fuchsberg, J. (dissenting).
As I see it, the primary problem. we face in this case is not so much with the articulation of legal principles but, rather, as is so often true, how they are applied to the facts at hand. That, of course, is the truest measure of the meaning of the words with which we give expression to our ideas. On my analysis, that observation has particular pertinence here because, by almost any supportable legal standard, I believe we are required to hold that (1) the unavailability of Pat Adams deprived the defendants of a fair trial and (2) the People were responsible for her unavailability
The Witness Adams’ Importance
The events in which Adams played a crucial role in this case, as well as in the companion case of People v Law, were central to the determination of the defendants’ guilt or innocence.
Without question, the Jenkins and Daniel cases are intertwined. As to each one of these defendants, the People’s chief witness was its undercover agent, Herritage, who testified that the events which concern us were initiated when Adams, a prostitute and paid confidential informer, left the agent’s car, approached Daniel on the street and there engaged him in a conversation of which Herritage did not claim he overheard any part. Since neither Herritage nor Daniel ever asserted that any other person was present at this conversation, in the absence of Adams the court could look to no one but Daniel, who took the stand in his own defense, to recount what he and Adams had had to say to one another; Daniel swore that it consisted of a plea that he find someone who would sell her drugs which she desperately needed because she was sick. Largely posited on that conversation, Daniel’s defense, i.e., that the relationship between himself and Adams, who, admittedly was then acting on behalf of the police, was that of principal and agent, a fact which, if credited, would preclude conviction (see People v Lindsey, 16 AD2d 805, affd 12 NY2d 958), could be verified or discredited by Adams alone.
Nor was that all. Herritage further testified that, following *315 the afore-mentioned conversation, Daniel and Adams entered Herritage’s car and that, at that time, Herritage asked Daniel to sell him some heroin and advanced some money to Daniel for that purpose. At trial, Daniel denied the truth of this second conversation. Since, according to Herritage himself, no one else but the three of them were present at this second conversation, again Adams’ testimony would have gone to the heart of the matter.
At trial, Herritage went on to relate how the same three had next met at a bar a short time later that day.'Daniel, who admitted this second meeting took place, was accompanied there by Jenkins, who was a tenant of Daniel, and, according to Daniel, ignorant of the contents of a package that Daniel had asked him to hold contained heroin, which Daniel claimed he purchased earlier that day in compliance with Adams’ request. No witness contradicted Daniel’s testimony as to how Jenkins came to be present and, as a consequence, proof of the latter’s knowing participation, as a practical matter, was in this instance almost entirely dependent on whether Daniel was to be believed or not. Also, at this meeting, again according to Herritage, Jenkins, though saying nothing, handed him the package; Daniel’s testimony, on the other hand, was that Jenkins had handed the drugs to Adams, which presumably would bear out the story that it was for her and not for Herritage. Thus as to every phase of their dealings, Adams, if produced, was key to the resolution of the sharp conflict between Herritage’s and Daniel’s stories.
Not even the back-up police officers who, at the various times, had seen Adams, Herritage, Daniel or Jenkins together, were able to shed a single ray of light on the actual conversations or transactions. As Mr. Justice Robert Kennedy, the Trial Judge, noted, the informer "was the only person in a position to corroborate the testimony of either Officer Herritage or the defendant”. It seems impossible therefore to suggest that her production would not be vital to the ultimate issue of guilt or innocence and even more impossible to suggest that it was not "relevant” or "material” or adequate to satisfy the so-called "higher standard of materiality and relevance” referred to by the majority.
Review of the facts in the companion Law case, which was argued before us jointly with those of Jenkins and Daniel, serves to underline that the People were bound to know that Adams would be crucial to the defense of these cases. As to all *316 three, the alleged crimes were committed at about the same time, the police operatives were identical and the disappearance of Adams had a like effect.
At Law’s trial, Herritage testified that, having been introduced to that defendant by Adams, he told Law that he wished to purchase heroin. According to Herritage, the three of them then went to another building, where Herritage gave the defendant $130 and the defendant handed him some packets of heroin in return. At the trial, Law denied either of these transactions. Since, aside from the undercover agent and the defendant, the only other person present was Adams, it is obvious the determination of which of them was telling the truth would likely turn on her testimony.
Herritage went on to testify to a second purchase of heroin from Law. This was three days later; once again, he claimed Adams was the only other person present. Once again, as in Jenkins-Daniel, not one of the back-up officers had overheard the conversations or seen anything pass between Herritage and Law. Obviously, then, Adams alone was the only other one in a position to bring firsthand knowledge of the events to the fact-finding process.
In the light of all the foregoing, I confess I am at a loss to understand how the majority can suggest that there is nothing to show that Adams’ testimony "in some way, or in some fertile imagination * * * might provide something” when in fact it is difficult to conceive of anyone in this case in a position to provide more. I can only speculate, therefore, that what the majority intends to say is that the defendants were required to prove that her testimony would have been favorable to them. To ask that, especially in these cases, where the informer has not only been no more, available to the defendants for interview than she was for testimony and where a shielding custodial relationship between the police and herself persisted from a time prior to the commission of the alleged crimes right through the entire period until they permitted her to vanish, would, I respectfully suggest, be but to mock the fundamental "right[s] to confrontation, due process, and fairness” of which we wrote so earnestly in People v Goggins (34 NY2d 163, 168, cert den 419 US 1012) and upon which the ability of a defendant to resist wrongful conviction is utterly dependent.
*317 The Informer’s Unavailability
As indicated, until they assisted her in her departure for Florida, the People maintained close control of Adams; the crimes were committed in the Jenkins-Daniel case on October 25, in the Law case on October 23 and 26. The record shows that since even on an earlier date, October 11, 1973, Adams was in the custody of the Monroe County Sheriff; by November 16, 1973 the authorities at their expense had checked her into the Rochester Flagship Hotel under an assumed name where she could be kept under effective surveillance; on December 6, 1973, they took her directly from there to the airport. They certainly were aware of the fact that only Adams, Herritage and the defendants had witnessed the sales, the payments and the deliveries on which these prosecutions were grounded; for whatever they may have been worth, even the collateral issues as to credibility that arose at trial were then still matters for the future. Defendants’ motion for disclosure of the informer’s identity, albeit unsuccessful, also alerted the People both to the fact that the defendants believed Adams was being maintained at the Flagship Hotel under the People’s control and that they would probably seek Adams’ production.
It therefore challenges credulity that the People not only assisted in Adams’ departure from the jurisdiction, but appeared almost to have deliberately avoided any effort to maintain continuing contact with her thereafter. It would have been a simple matter to arrange that she be met and her intended whereabouts ascertained when she alighted in Orlando, Florida, all the more so since the co-operation of the Federal authorities, who had provided the funds for the flight, was available to the People; instead, the police never even so much as asked her for a forwarding address. Not once, until months later, when, at the trial court’s prompting, they for the first time engaged in a last-minute, overnight and, not surprisingly, fruitless attempt to learn her whereabouts, mostly limited at that eleventh hour to the use of the long distance telephone, had they lifted a finger to ascertain her location. This hardly should be described by such adjectives as "diligent”, "adequate” or "reasonable”.
It must be remembered that this picture of neglect, if that is all it was, is that of a specialized professional police unit sophisticated in the ways of confidential informers and under *318 cover agents and highly trained in all aspects of drug law enforcement. After all, they had the occasion to learn her state of mind, to know how helpful or harmful her testimony was likely to be to each side. Indeed, it would be naive to fail to conclude from the signposts provided by this seemingly practiced avoidance of even a minimal effort to maintain contact with Adams that there was not at least a calloused unconcern, if not a conscious hope, that things would end up, as indeed as they did, with her unavailability at the time of trial. If these circumstances do not require a finding of bad, faith as such, they at least rise to the level of such reckless disregard for the elementary rights of each defendant to a fair trial as to constitute its equivalent (see United States v Agurs, 427 US 97; Brady v Maryland, 373 US 83, 87; People v Kiihoa, 53 Cal 2d 748; Hernandez v Nelson, 298 F Supp 682, affd on opn below 411 F2d 619).
Accordingly, reversal and dismissal is called for in each case.
Chief Judge Breitel and Judges Jasen, Jones, Wachtler and Cooke concur with Judge Gabrielli; Judge Fuchsberg dissents and votes to reverse in a separate opinion.
In People v Jenkins and People v Daniels: Order affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur in memorandum; Judge Fuchs-berg dissents in part and votes to reverse and dismiss the indictment in a separate opinion.
In People v Law: Order reversed, etc.